

# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

BRYANT HOLMES,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　Respondent,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　　　　WD86357
　　　　　　　　　　　　　　　　　　　)
MISSOURI DEPARTMENT OF　　　　　)
CORRECTIONS,　　　　　　　　　　　　)　　　　　Filed:  August 20, 2024
　　　　　　　　　　　　　　　　　　　)
　　　　　Appellant.　　　　　　　　　)

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
## THE HONORABLE J. DALE YOUNGS, JUDGE

## BEFORE DIVISION ONE: LISA WHITE HARDWICK, PRESIDING JUDGE, ALOK AHUJA, JUDGE AND ANTHONY REX GABBERT, JUDGE

The Missouri Department of Corrections ("DOC") appeals the circuit court's denial of its motion for judgment notwithstanding the verdict ("JNOV") following a jury verdict in favor of Bryant Holmes on his hostile work environment claim under the Missouri Human Rights Act.  On appeal, the DOC contends the circuit court erred in denying the JNOV motion because Holmes failed to present substantial evidence supporting two elements of his hostile work environment claim.  For reasons explained herein, we affirm the judgment and remand the case for determination of an award of attorney's fees on appeal.

## FACTUAL AND PROCEDURAL HISTORY

Bryant Holmes began his employment with the DOC in 1993 as a correctional officer. He was promoted to chief of custody at a probation and parole center in 2008 and became deputy warden in 2015, when the center converted to a prison known as the Kansas City Reentry Center ("KCRC"). As a deputy warden, Holmes began reporting directly to the warden of the KCRC, L.A. ("Warden"). Warden also supervised other executive staff members, including another Deputy Warden, the Chief of Custody, and an Administrative Assistant, all of whom were female.

Shortly after the reporting relationship began, Warden instructed Holmes that he was "required to say good morning" to her, regardless of when he arrived and what he was doing. Warden told Holmes that the greeting was necessary because "I didn't sleep with you last night. I need a good morning." On days when Holmes did not say "good morning" to Warden, she became upset with him and the staff. Warden also disallowed female staff from meeting or interacting with Holmes in her absence, directed the Administrative Assistant and Chief of Custody to no longer report to Holmes, and interfered with tasks he assigned to them. The staff began urging Holmes to say "good morning" to Warden when he arrived at the office so they could "have a nice day."

Holmes complained to Warden's DOC supervisor in Jefferson City and requested an investigation into Warden's conduct and the work environment. Following these complaints, Holmes, Warden, and Deputy Warden participated in a mediation with the human resources manager in October 2015. Holmes was provided steps to improve communication with Warden, such as carbon-copying Warden on emails, but Warden

2

received no instruction regarding her behavior. After the mediation, Warden continued her practice of requiring Holmes to say "good morning" and excluding him from meetings with the Deputy Warden and Chief of Custody.

In September 2016, Holmes received a negative performance log note from Warden. Holmes asked Warden to remove the negative note because it was unjustified, but she did not. In December 2016, Warden placed Holmes on a performance improvement plan. In 2017, Holmes was transferred to an assistant warden position in DOC's St. Joseph facility. He was assigned to a cubicle instead of an office and reported to the deputy warden. The DOC refused to provide Holmes a state vehicle or include commute time to St. Joseph in his workday.

In January 2018, Holmes filed a petition against the DOC alleging discrimination claims based on race, sex, hostile work environment, and retaliation pursuant to the Missouri Human Rights Act.[1] At the jury trial, Holmes and other staff members testified about Warden's offensive and differential treatment of Holmes based on his male gender and how it made the office an uncomfortable place to work. The jury returned a verdict for DOC on the claims for race discrimination, sex discrimination, and three retaliation claims. The jury found in favor of Holmes on the hostile work environment claim and awarded $600,000 in compensatory damages. The circuit court subsequently awarded Holmes $601,785 in attorney's fees and $29,632.85 in costs and expenses.

---

[1] At the time of filing, the petition listed Warden and her supervisors as defendants, but Holmes voluntarily dismissed all claims against the individual defendants before trial.

3

DOC filed a JNOV motion asserting the evidence was insufficient to show that Holmes was subjected to unwelcome harassment based on his sex and that the harassment was severe or pervasive. The court denied the motion, and DOC appeals. Holmes requests an award of his attorney's fees on appeal.

## STANDARD OF REVIEW

The DOC's two points on appeal challenge the circuit court's submission of Holmes's hostile work environment claim to the jury, as challenged in the JNOV motion. "The standard of review of the denial of a JNOV is essentially the same as the overruling of a motion for directed verdict." *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 14 (Mo. banc 2012). "A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011) (quoting *Inv'rs Title Co. v. Hammonds*, 217 S.W.3d 288, 299 (Mo. banc 2007)). Whether a plaintiff has made a submissible case is a question of law subject to *de novo* review. *Id*. We view the evidence "in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007). "The jury's verdict will be reversed only if there is a complete absence of probative facts to support the jury's conclusion." *Keveney v. Mo. Military Acad.,* 304 S.W.3d 98, 104 (Mo. banc 2010).

4

## Evidence of Harassment Based on Sex

In Point I, the DOC asserts the circuit court erred in denying its motion for a JNOV on the hostile work environment claim because the evidence was insufficient to show that Holmes was subjected to unwelcome harassment based on his sex. Specifically, the DOC argues that Holmes relied on "stray, innocuous comments, and speculative and forced inferences" from evidence that was not probative of whether he was harassed by his supervisor because he is male.

The Missouri Human Rights Act prohibits employers from discriminating against an employee based on their sex. § 213.055.1. [2] To successfully allege a hostile work environment claim based on sexual harassment, Holmes was required to demonstrate: (1) he "is a member of a protected group; (2) [he] was subjected to unwelcome sexual harassment; (3) [his] gender was a contributing factor in the harassment; and (4) a term, condition or privilege of [his] employment was affected by the harassment." *Darks v. Jackson Cnty.*, 601 S.W.3d 247, 255–56 (Mo. App. 2020) (quoting *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 666 (Mo. banc 2009) (footnote omitted)). "A contributing factor is a condition that contributes a share in anything or has a part in producing the effect." *McGaughy v. Laclede Gas Co.*, 604 S.W.3d 730, 745 (Mo. App. 2020).

Holmes testified at trial regarding Warden's unwelcomed comments and behavior toward him that was different from her treatment of the female staff. These incidents of

---

[2] All statutory references are to the Revised Statutes of Missouri 2016, as updated by the 2020 Cumulative Supplement.

harassment were verified by staff members who witnessed the encounters between Holmes and Warden. The Deputy Warden working in the office across from Holmes testified that she observed Warden walk by Holmes's office while he was in a meeting, say hello, and when Holmes did not respond, Warden interrupted his meeting and demanded that he say hello to her. Deputy Warden was present at a subsequent meeting when Holmes addressed Warden's disruption and asked her to wait for his meetings to end before saying hello. Warden responded, "Well, I didn't sleep with you last night. I need a good morning." Deputy Warden testified she felt "very weird and uncomfortable," and Holmes appeared very uncomfortable. Deputy Warden believed that Warden's statement violated D2-11.47, the DOC's sexual harassment policy, because it was directed to Holmes based on his male gender.

Holmes testified that when Warden first told him he needed to say "good morning" to her because he did not sleep with her last night, he was "caught off guard [and it] shook me up." He responded that Warden's comment was inappropriate, and he did not appreciate it. Holmes testified that Warden continued to make the comment about sleeping with her in the presence of staff members, during a meeting with the Deputy Warden and the Chief of Custody, in a meeting with Warden's supervisor, and in a mediation meeting with the human resources manager following his request for an investigation.

Holmes further testified that when he interacted with female staff, Warden would eavesdrop, interrupt the meeting or conversation, remain in his office until the staff member left, pull him out of the meeting, or demand an explanation as to why the person

6

was there and what was discussed. Despite his career experience in offender management, Warden would not allow him to assist the Deputy Warden and the Chief of Custody with workload and staffing issues at KCRC. Warden subsequently began holding separate meetings with the female staff so Holmes could not contribute or directly interact with them regarding work matters.

During the investigation of Holmes's complaints by the human resources manager, the Deputy Warden stated she struggled in the workplace and felt uncomfortable in executive meetings with Warden and Holmes because Warden would roll her eyes and make faces when he was speaking. Holmes also testified Warden would stare at him during meetings and staff members in attendance would wonder "why she was constantly staring at him like that."

The Administrative Assistant testified that she believed Warden had a "crush" on Holmes. Warden went "ballistic" and demanded to know why she "did not get the memo" when Holmes wore the same color shirt as a female staff member. Warden instructed Assistant not to speak or work with Holmes and to direct her questions to Warden, despite the fact that Assistant was hired to provide office support to both Warden and the deputy wardens. Assistant testified that Warden was rude to female employees if they spoke to Holmes, and Warden was kinder to everyone if Holmes said "good morning" to her. Accordingly, Assistant routinely asked Holmes to say "good morning" to Warden to improve the work environment.

Similarly, the Chief of Custody testified that Warden instructed her to no longer report to Holmes. Despite Holmes's recent tenure in the chief of custody role, Warden

7

assigned the Chief of Custody a mentor in St. Joseph to help her learn her position. Warden allowed both the Chief of Custody and Administrative Assistant to report to the other deputy warden, rather than Holmes.

Holmes testified that the urging from staff say "good morning" to Warden made him feel he needed to belittle himself to appease Warden and avoid conflict between Warden and staff members. Holmes complained to the deputy division director and the human resources manager that he was offended and uncomfortable in his work environment because Warden's statements and conduct prevented him from working with the female staff.

This collective testimony provided probative evidence that Holmes's male gender was a contributing factor in the harassment from Warden. Certainly, Warden's demand for a "good morning" because she did not sleep with Holmes exhibited conduct of sexual nature. Likewise, Warden's conduct and statements prohibiting female employees from interacting with Holmes expressed a desire to be exclusively acknowledged by Holmes and isolate him based on his sex. The evidence was sufficient to support the jury's consideration of whether Holmes's gender contributed to his harassment. *Darks*, 601 S.W.3d at 258. Point I is denied.

**Evidence of Severe or Pervasive Conduct Affecting Employment**

In Point II, the DOC contends the circuit court erred in denying its motion for a JNOV on the hostile work environment claim because Holmes failed to present evidence of conduct objectively severe or pervasive to affect a term, condition, or privilege of employment or Holmes's work performance. The DOC argues Holmes's description of

8

an unpleasant environment and testimony that he was able to continue performing his job demonstrates that a reasonable person would not find Warden's conduct severe or pervasive.

"Discriminatory harassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive enough to alter the conditions of a plaintiff's employment and create an abusive working environment." *Id*. Our review of the record indicates that Holmes presented ample evidence to submit this issue to the jury. As described *supra*, Holmes testified regarding the two-year period during which Warden required him to say "good morning" because he did not sleep with her and prevented him from working with other female employees. Holmes felt this conduct belittled him in the role of a deputy warden and required him to appease Warden to alleviate her hostility in the workplace. Holmes, the Deputy Warden, the Chief of Custody, and Administrative Assistant all testified that Warden's continuing offensive statements and conduct affected their ability to work together as members of the executive staff. The Deputy Warden testified she believed Warden's comments were inappropriate, violated the DOC's sexual harassment policy, and made her uncomfortable in the office.

After Holmes complained to Warden's supervisor about the harassment and participated in a mediation with the human resources manager, Warden's mistreatment of him continued. Warden issued Holmes a negative log note and then placed him on a performance improvement plan. Holmes was ultimately demoted and transferred to a facility in St. Joseph.

"Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." *Id.* The evidence here was sufficient for the jury to conclude that Warden's harassment altered the conditions of Holmes's employment and created an abusive working environment. Because we reverse only for a complete absence of probative facts to support the jury's finding, the DOC fails to demonstrate why the court should have granted its motion for a JNOV on Holmes's hostile work environment claim. Point II is denied.

### Attorney's Fees on Appeal

Holmes has timely submitted a motion for award of attorney's fees on appeal, pursuant to Missouri Court of Appeals, Western District Special Rule 29. In awarding such fees, we follow the "American Rule," which provides that "orders requiring one party to pay another party's attorney's fees or other expenses ordinarily are not permitted unless the parties' contract or a statute authorizes the court to make such an award." *Birdsong v. Children's Div., Mo. Dep't of Soc. Servs.*, 461 S.W.3d 454, 459 (Mo. App. 2015) (internal citation and quotations omitted). The MHRA contains a fee-shifting provision that authorizes this court to make an award of attorney's fees to the prevailing party. *See* § 213.111.2. "A prevailing party is one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing suit." *Wilson v. City of Kansas City*, 598 S.W.3d 888, 898 (Mo. banc 2020) (citation omitted). "Where a plaintiff has prevailed in an action under the MHRA, the court should award attorneys' fees unless special circumstances would render such an award unjust."

10

*McCrainey v. Kansas City Mo. Sch. Dist.*, 337 S.W.3d 746, 756 (Mo. App. 2011) (citations and quotations omitted).

As discussed herein, Holmes has prevailed on the DOC's appeal. Therefore, we grant his motion for attorney's fees on appeal. "Although this court has the authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Id.* (citation and quotations omitted). Accordingly, the case is remanded for further determination of the attorney's fees to be awarded for the appeal.

## CONCLUSION

The judgment is affirmed. The motion for attorney's fees on appeal is granted, and the cause is remanded to the circuit court for determination of a reasonable award of attorney's fees.

_____
LISA WHITE HARDWICK, JUDGE

All Concur.